1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES JOSEPH OLAGUE,

11          Petitioner,                    No. CIV S-10-1659 GEB CHS

12      vs.

13   ANTHONY HEDPETH,

14          Respondent.         FINDINGS AND RECOMMENDATIONS

15   _____/

16                    I.  INTRODUCTION

17          Petitioner Olague, a state prisoner, proceeds pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Olague stands convicted of first degree murder and

19   attempted murder in the Yolo County Superior Court, case number 035627, for which he was

20   sentenced to life in prison without the possibility of parole in addition to other consecutive terms.

21                    II.  BACKGROUND[1]

22          Olague was charged by indictment, together with his two co-defendants at trial

23   (Ernesto Duran Arellano and Oscar Hurtado Cervantes), and four others (Christina Marie

24   Marten, Nathaniel Easlon, Richard Betancourt, and Gilberto Lopez) with committing the

25   _____

26       [1] *See People v. Olague*, et al., No. C053372, 2009 WL 924503, at 1-3 (Cal. App. Third
Dist., 2009).

1

following crimes on Halloween in 2002:[2]

> Count 1: First-degree murder of Robert Stepper (§ 187, subd. (a)), with enhancements alleging the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)), Cervantes used a firearm which caused death or bodily injury (§ 12022.53, subds.(a), (d)), and a principal personally discharged a firearm causing death or bodily injury (§ 12022.53, subd. (a)).

> Count 2: First-degree murder of Eric Folsom, with the same enhancements as above.

> Count 3: Attempted murder of Vicki Folsom (§§ 187, subd. (a); 664, subd. (a)), with the same enhancements as above.

> Count 4: Attempted murder of Jessica Valdez, with the same enhancements as above.

The indictment also alleged special circumstances for multiple murder and intentional killings as participants in a criminal street gang (§ 190.2, subds. (a)(3), (a)(22)).  The prosecutor sought the death penalty against Arellano and Cervantes, but not against Olague.

At trial, the prosecution presented evidence supporting its theory that, although the Norteño and Sureño gangs were rivals, their members cooperated in committing these crimes because Arellano (a Norteño leader or "shot caller") and nonparty Candelario Garza (a Sureño leader) cooperated in the sale of drugs in Woodland.  Arellano (a Norteño) ordered the hit because victim Stepper (a Norteño) owed him money for drugs, and Arellano wanted to send a message to others who owed money and re-instill fear in the community.  Christina Marten (a Norteño) brought Stepper to the place of attack.  The shooter was Cervantes, who was not a gang member but who associated with Norteños, Sureños, and Crips.  Stepper was the target, and the other victims were shot either because they were in the "kill zone" or because Cervantes intentionally shot them in an attempt to eliminate witnesses.  Easlon (a Crips gang member)[3]

---

[2] Marten was convicted in a separate trial.  Easlon, Betancourt and Lopez negotiated dispositions and testified as prosecution witnesses at the trial of Olague and his co-defendants.

[3] There were so few Crips in Woodland that they had "kind of a peace treaty with the Norteños."

acted as lookout.  Arellano's neighbor, Gilberto Lopez (a Sureño), was the getaway driver.
Olague (a Sureño) was on the street at the time of the shooting to ensure that all participants did
what they were supposed to do.

Easlon and Betancourt (Norteño) testified about a gathering at Arellano's
apartment on Halloween in 2002, before the shootings.  At the gathering, Arellano asked Easlon
and Betancourt to "fuck up" (beat up) Robert Stepper, who owed Arellano about $500 to $800
and was not doing what he was supposed to be doing to help the drug trade.  Easlon (who owed
Arellano $1,600 for drugs) and Betancourt refused to do the actual deed, because Stepper was
their friend.  Arellano asked Cervantes, who was also there, to "handle it."[4]  Cervantes agreed
and was given some drugs. Easlon, to pay off his debt, agreed to Arellano's request to station
himself at the end of the street on Halloween and "make sure nobody we know goes down that
street...."  Lopez came to the door and was told by Arellano, "[i]t's going to go down," and
Lopez was needed as the getaway driver.  (Though Lopez had a "beef" with Cervantes, who
impregnated Lopez's girlfriend, there was evidence that Lopez did not know Cervantes would be
involved.)  Arellano took a phone call, then said "Jaime" and Garza were on the way over with
the gun and told Easlon and Betancourt to leave.  Easlon testified he knows three "Jaimes," one
of which is Olague.  Easlon did not stay and therefore did not know if it was Olague who showed
up.  However, Easlon testified it was Olague who showed up when the crime took place.

On Halloween, around 10:00 p.m., as planned, Easlon concealed himself at the
end of Oak Avenue to stand watch.  Marten walked Stepper down Oak Avenue and then left.
Stepper began chatting with the other victims near a pickup truck in victim Valdez's driveway.
Olague, whose job was to make sure others did their job, walked Cervantes partway down the
street.

As related by the surviving victims, a man approached the victims, "kind of"

---

[4] Richard Betancourt testified "handle it" in gang lingo could mean anything from a
beating to a killing.

3

grinned, pulled out a gun, aimed the gun at Stepper's head, and fired from a distance of two feet (killing Stepper).  The shooter then pointed the gun at the others and fired multiple times (killing 17-year-old Eric Folsom and injuring 14-year-olds Vicki Folsom and Jessica Valdez).  At trial, one of the survivors identified Cervantes as the shooter, though she had not identified him in a photo lineup.

As Lopez drove the getaway car, Cervantes hit the dashboard and said, "I got 'em, I got 'em."  Lopez had not expected any shooting.  He later told Garza that Veronica Lugo (girlfriend of Guillermo Ramirez, who had been with Lopez) was in an alley and heard the gunshots.  Lugo testified she was summoned to an apartment the next day where several people, including Cervantes and Olague, were present.  Garza, Lopez, and Ramirez led her into a bedroom and told her to keep her mouth shut or she and her children would be killed.

An expert in criminal gangs, Sergeant Steven Gill, said rival gangs do work together in drug activity and will commit a crime such as murder together to further their criminal enterprise, enhance both gangs' reputations, and further instill fear and intimidation in the community and other gang members.  A non-gang member's participation would be a way to be accepted by the gangs.

Olague and both of his co-defendants testified at trial and denied any involvement. Arellano (age 34 at trial) said he was a Norteño for 10 years but was not a shot caller.  He denied any pre-Halloween meeting, denied ordering or suggesting that anyone kill Stepper, and said he did not even know Cervantes or Olague before Halloween 2002, except for an incident where he almost got into a fight with Olague (whom he pegged as a Sureño).  Arellano admitted that on one occasion he told Cervantes to "handle it" but testified he was telling Cervantes to go get a pipe to smoke drugs.  Stepper was Arellano's friend, did not buy drugs from him, and did not owe him money.  On Halloween, Arellano was on his way home, saw Stepper, said hello, and noticed a car full of people wearing blue (a Sureño color).  Arellano said his only prior crimes were spousal abuse, selling drugs, and participating in a prison riot in which he was just

4

following gang orders, though he was in front of his cohorts.

Cervantes (age 28 at trial) testified he has never belonged to a gang, though he knew gang members. He knew Olague before Halloween, but not Arellano. When arrested, Cervantes said he "knew this day was coming," but he thought he was being arrested for violating probation. Cervantes denied telling his cellmate, Richard Bowie, about the case and denied tampering with his handcuffs (evidence of which was adduced as an escape attempt). Cervantes had a prior felony conviction for selling drugs and a drug-related misdemeanor. Alibi witnesses testified Cervantes was with them that night.

Olague (age 29 at trial) testified he was a gang member when he lived in Los Angeles (he equivocated on whether it was Sureño) and associated with "southerners" when he moved to Woodland. He was friendly with Cervantes. Olague did not know or have any contact with Arellano, except Olague ran from a brief confrontation with Arellano as a member of a rival gang in a parking lot about a month before the crimes. Olague denied any involvement in the crimes. He came upon the crime scene after a friend dropped him off and he was walking to a friend's house. Olague admitted two prior felony convictions, for auto theft and verbally threatening his ex-wife.

To advance the defense theory that the police pressured the accomplices to make false confessions consistent with the prosecution's theory, the defense hammered at inconsistencies in the accomplices' statements, and a defense expert testified about how police interrogations can elicit false confessions.

In May 2006, the jury returned verdicts finding all three defendants guilty on all counts and in addition finding true all enhancement allegations. The trial court denied defense motions for new trial.

Olague was sentenced to life without the possibility of parole on Counts 1 and 2 (first degree murder), seven years on Count 4 (attempted murder) and a consecutive term of two years, four months on Count 3 (attempted murder). The court imposed additional terms of 25-

years-to-life as firearm enhancements on Counts 1 through 3.

Olague and his co-defendants appealed to the California Court of Appeal, Third District. The court of appeal modified co-defendant Cervantes's sentence but affirmed the convictions and sentences in all other respects. A petition for review to the California Supreme Court was denied.

### III.  GROUNDS FOR RELIEF

The petition sets forth eight grounds for review:

Grounds One and Two:  Prosecutorial and governmental misconduct rendered the trial fundamentally unfair and the trial court erred when it denied the defense motion to recuse the prosecutor for the alleged misconduct;

Grounds Three and Four: The trial court made two instructional errors;

Ground Five:  The trial court erred in not granting the defense's motion for acquittal following the prosecution's case-in-chief;

Ground Six:  The trial court erred in admitting an expert's opinion that Olague was a Sureno "shot caller" based on hearsay;

Ground Seven:  The trial court denied Olague his right to present a complete defense when it excluded evidence of third party culpability;

Ground Eight: The court erred at sentencing on the firearm enhancements.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under

1  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

2  state court proceedings unless the state court's adjudication of the claim:

3          (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
4          determined by the Supreme Court of the United States; or

5          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
6          State court proceeding.

7  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

8  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

9          This court looks to the last reasoned state court decision in determining whether

10  the law applied to a particular claim by the state courts was contrary to the law set forth in the

11  cases of the United States Supreme Court or whether an unreasonable application of such law has

12  occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919.  The

13  state court's factual findings are presumed correct if they are not rebutted with clear and

14  convincing evidence.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir.

15  2004).  It is the habeas corpus petitioner's burden to show the state court's decision was either

16  contrary to or an unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19,

17  123 S. Ct. 357, 360 (2002).

18                                   V.  DISCUSSION

19          A.      Grounds One and Two: Prosecutorial Misconduct

20          Olague claims that multiple acts of prosecutorial and governmental misconduct

21  rendered his trial fundamentally unfair and that the prosecutor should have been recused.

22  Specifically, Olague contends (1) the Yolo County District Attorney improperly addressed the

23  grand jury before the court reporter set up the equipment; (2) the police conducted a warrantless

24  search of his jail cell and interfered with his attorney client relationship by bringing criminal

25  charges against his trial attorney for failing to redact witness information; (3) the police altered

26  the crime scene before the jury viewed it; (4) the prosecution approached a defense witness in the

1  hallway and attempted to coerce that witness's testimony; and (5) the prosecutor improperly

2  contacted a potential defense expert without identifying himself as a prosecutor in the case.

3  Olague contends these acts of misconduct require reversal, either individually or cumulatively.

4         The appropriate standard for a federal court reviewing a claim of prosecutorial

5  misconduct on habeas corpus is the narrow one of whether the conduct violated due process.  *See*

6  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "The relevant question is whether the

7  prosecutor's error 'so infected the trial with unfairness as to make the resulting conviction a

8  denial of due process.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S.

9  637, 643 (1974)); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1983) ("the touchstone of due

10  process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

11  culpability of the prosecutor").

12         Factors to be considered in determining whether habeas relief is warranted include

13  whether the prosecutor manipulated or misstated the evidence; whether the conduct implicated

14  other specific rights of the accused; whether the objectionable content was invited or provoked

15  by defense counsel's argument; whether the trial court admonished the jurors; and the weight of

16  the evidence against the defendant.  *Darden*, 477 U.S. at 181-82.  Relief is limited to cases in

17  which the petitioner can establish that the misconduct resulted in actual prejudice.  *See Johnson*

18  *v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38).  In

19  other words, prosecutorial misconduct in violation of due process warrants habeas corpus relief

20  only if it had a "substantial and injurious effect or influence in determining the jury's verdict."

21  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying *Brecht's* "harmless error" test in

22  evaluating a claim of prosecutorial misconduct on habeas corpus).

23              1.    Prosecutor's Comments to the Grand Jury

24         Because this was a capital case, section 190.9 of the California Penal Code

25  required that all proceedings be transcribed.  At the grand jury proceeding, however, in the

26  minutes it took for the court reporter to set up the equipment, the District Attorney made

1  unreported comments to the grand jurors.  According to the testimony of the District Attorney,

2  the court reporter present at the grand jury proceeding, and two deputy district attorneys who

3  later became the trial prosecutors, the District Attorney told the jurors that because this was a

4  gang case, extra security was present in and around the building, and the grand jurors should be

5  aware of their surroundings as they came and went to their cars and should report any suspicious

6  individuals to police officers.  *People v. Olague*, *supra*, at 3.  One of the grand jurors asked if

7  police could escort them to their cars, and the DA said police would oblige if any juror requested

8  an escort.  *Id*.

9          Based on the foregoing, the defense moved to dismiss the case.  The trial court

10  denied the motion, concluding (1) the proceedings had not yet reached a critical state requiring a

11  reporter's transcript when the comments were made and (2) nothing was said to sway or affect

12  the impartiality of the grand jury.  On appeal, the state appellate court found no prejudice had

13  ensued, and held that the District Attorney's comments did not warrant reversal.  *People v.*

14  *Olague*, *supra*, at 4.

15          The right to a grand jury presentation does not apply to the states.  *See Beck v.*

16  *Washington*, 369 U.S. 541, 545 (1962).  Where a state voluntarily uses a grand jury procedure,

17  the question whether the Due Process Clause requires it to furnish an unbiased grand jury has

18  been left open by the Supreme Court.  *See Id*. at 546.  Under California law, a grand jury

19  proceeding is not an adversary hearing adjudicating guilt or innocence but rather is an *ex parte*

20  investigation to determine whether a crime has been committed and whether criminal

21  proceedings should be instituted against any person.  *See* Cal. Penal Code § 939 et seq.  Due to

22  the nature of the grand jury proceeding in California, it is clear that nothing said by the District

23  Attorney had substantial and injurious effect or influence in determining the jury's verdict at

24  trial.  As explained by the state court,

25          [f]or the most part, the District Attorney told the grand jury no
            more than they would find out from the opening statement...  The
26          District Attorney did also say that extra security was present-

9

1   information that may or may not have come out later in the
2   proceedings.  Upon inquiry, he also said grand jurors could request
    an escort to their car.  He also said they should be aware of their
    surroundings and report any suspicious activity.  However, any
3   prejudice came from the elementary fact that this was a gang case-
    a fact which the grand jury would learn as soon as the opening
4   statement began.

5   *People v. Olague*, *supra*, at 5.  Any misconduct by the District Attorney at the grand jury

6   proceeding was harmless as to the verdict rendered at trial and Olague is not entitled to relief.

7            2.      Jail Cell Search and Criminal Charges against Defense Counsel

8            On January 23, 2004, police searched the jail cells of all three co-defendants

9   following the beating of Keen Thurman, an inmate housed in a different facility who testified

10  before the grand jury in this case.  Police were looking for evidence of a relationship between the

11  defendants and Thurman's assailants.  Police believed Arellano had ordered the assault.[5]  From

12  Olague's cell, police seized copies of grand jury transcripts with his handwritten notes, in

13  addition to police reports, letters and photographs relating to this case.  Some of the documents

14  were in an envelope labeled "attorney-client."  The police reports contained unredacted witness

15  information, in violation of state law (*see* Cal. Penal Code § 1054.2), which resulted in criminal

16  charges being brought against Olague's attorney.  Because of the concern about unredacted

17  witness information, a second search was conducted, during which an unredacted grand jury

18  transcript was seized.  The officers who viewed the documents testified they scanned them for

19  failure to redact; they did not recall seeing or reading any handwritten notes.

20           Olague moved to recuse the district attorney's office or to dismiss the action for

21  governmental misconduct.  He claimed the search and criminal charges were an attempt by the

22  government to intimidate defense counsel.  Olague claimed the prosecution and its agents had

23  prevented him from preparing a meaningful defense and deprived him of the effective assistance

24  of counsel.  At a hearing on the motion, the prosecution adduced evidence that envelopes from

25
26          [5] At trial, Thruman testified the beating was unrelated to this case.

10

1  Arellano had been found in the jail cell of one of Thurman's assailants, though the letters did not

2  reference the Halloween murders.  The trial court denied recusal or dismissal, reasoning that

3  there was no outrageous conduct, that it was appropriate to investigate the apparent transgression

4  of counsel in failing to redact the documents, and that there was no evidence that any attorney in

5  the district attorney's office read the documents.

6          On appeal, the state court held that the jailhouse search and seizure provided no

7  grounds for reversal.  In particular, the state court found Olague failed to show the government

8  affirmatively took steps to interfere with the attorney-client relationship or that the contents of

9  any privileged communications were actually read.  *People v. Olague*, *supra*, at 11-12.  Olague

10  fails to overcome the presumption of correctness that applies to these findings of fact; his

11  allegations that the search and seizure was an attempt by the government to intimidate defense

12  counsel and that the police's viewing of the materials somehow affected the fairness of his trial

13  are speculative, conclusory, and without evidentiary support in the record.  In sum, neither

14  misconduct nor prejudice is shown.

15                    3.        Jury View of the Crime Scene

16          Prior to trial, the court denied a defense request for the jury to view the crime

17  scene at night in order to see the layout.  The court stated it saw the street after presiding over

18  Christina Marten's trial, and there were significant changes in trees and shrubs, and a house and

19  fence had been built since the crimes.

20          At trial,

21      Easlon testified he hid at one end of Oak Avenue, as he had been
        instructed.  He saw Marten arrive with Stepper and leave alone.
22      Easlon saw Cervantes and Olague pass by.  Olague stayed on the
        sough side of the street.  Cervantes crossed to the north side, at
23      which point a tree blocked Easlon's view.  Easlon ventured further
        down the sidewalk.  He saw Cervantes cross back to the south side
24      of the street and walk quickly to the back of the truck, where
        Easlon saw silhouettes of people.  Easlon saw flashes and heard
25      gunshots.  Easlon said he saw Cervantes run away.  However,
        Easlon also said that, after Cervantes and Olague passed him, all
26      Easlon could distinguish was their bodies (i.e., he could not

11

1      necessarily identify them).  The evidence showed there was no
2      moon that night.

3  *People v. Olague*, *supra*, at 23.

4             Subsequently, over the prosecutor's objection, the trial court granted a defense

5  request for a jury view of the crime scene at night, despite the fact that the scene had changed.

6  The issue in the court's view was whether Easlon, from his vantage point, could have seen a

7  silhouette of a person near the driveway down the street.  Defendants waived their right to be

8  present.  The jury was taken to the crime scene on a night with no moon, like the night of the

9  crimes.  Upon arrival, defense counsel noticed that the government had altered the scene, without

10  notice, by placing temporary "No Parking" signs on the south side of the street.  The defense

11  objected but did not ask to cancel the jury view.  The court assumed parking was restricted for

12  security reasons and allowed the jurors to walk around and watch a person walk down the south

13  side of the street, cross diagonally and walk on the north side, and then cross back to the south

14  side and stop at the particular driveway.  The court told jurors, "We're not going out tonight to

15  try to recreate, say, this is what it was that night, or anything else.  It's just to give you an assist in

16  terms of what you might or might not be able to see."  *People v. Olague*, *supra*, at 24.

17             The next day, the defense requested a mistrial on various grounds, including

18  government manipulation of the crime scene.  Evidence had been adduced that 11 cars were

19  parked on the south side of the street at the time of the crimes.  Defense counsel argued their

20  view that, if the signs were placed for security purposes, parking should have been blocked on

21  both sides of the street.  The court was "bothered" by the fact the signs were placed without the

22  court's approval or knowledge.  Nevertheless, it was not clear whether the police acted

23  independently or at the prosecutor's direction, and the court found no showing of bad faith.  The

24  court found that the jury view was not tainted; cars parked on the street would not have blocked

25  the view down the sidewalk.  The motion for mistrial was denied.  At the close of the

26  prosecution's case in chief, the defense requested another jury view or a mistrial, those requests

1  were denied.  Defense counsel were allowed to argue to the jury that the absence of the cars made

2  a difference, but were precluded from arguing that the prosecutor altered the scene in an attempt

3  to affect the jury view since there was no evidence of bad faith.  On appeal, the state court held

4  that the trial court's ruling was not an abuse discretion and further found no prejudice.  *People v.*

5  *Olague*, *supra*, at 25.

6         Olague's claim in this regard assumes that the parking restriction could not have

7  been in place for security reasons because police allowed parking on the other side of the street.

8  The state appellate court opined, however, that the parking restriction could have been limited to

9  one side of the street as a compromise between enhancing visibility for security reasons and

10  minimizing inconvenience of the residents.  In any event, the state court's finding of no prejudice

11  is a reasonable application of Supreme Court precedent.  There is no reasonable probability that

12  the parking restrictions had a substantial and injurious effect or influence on the jury's verdict

13  where the jury knew that cars were parked there on the night of the offense and where counsel

14  was allowed to argue that the presence of cars affected visibility at the scene.

15                          4.       Witness Coercion/ Threats

16         When Betancourt was still a defendant, he denied being at a pre-Halloween

17  meeting at Arellano's apartment and said his family members in Greenfield would verify he was

18  with them every day before Halloween 2002.  After making his plea bargain, he testified as a

19  prosecution witness that he lived with family members in Greenfield before Halloween, but he

20  came to Woodland two or three times, and was present at the pre-Halloween meeting at

21  Arellano's home.

22         In an attempt to refute Betancourt's testimony about a pre-Halloween meeting, the

23  defense contended the gathering happened *after* Halloween.  Evidence was received as follows:

24         Betancourt's cousin, aunt, and grandmother[ ] testified he and they
        lived in Greenfield in October 2002, he ate dinner with them every
25         day, he had a work injury, and it takes three hours to drive to
        Woodland.

26

1    The aunt and grandmother also testified that, while they were in the
hallway outside the courtroom, waiting to testify, the prosecutor
2    approached them with two men (whom the prosecutor said would
be witnesses to the conversation), asked them if it was possible
3    Betancourt was in Woodland before Halloween, told them
Betancourt testified he was in Woodland before Halloween, and
4    told them he would be in trouble if his testimony was a lie.  The
prosecutor acknowledged this in his questions on cross-
5    examination.

6  *People v. Olague*, *supra*, at 51.

7    In addition, Jennifer Betancourt (Richard's cousin) testified for the defense that

8    [s]he lived in Woodland.  Richard came to visit on Halloween and
not before Halloween.  They were very close, and he would have
9    called her if he had come to Woodland.  She met Arellano for the
first time when she attended a gathering at his home with
10   Betancourt a couple of weeks after Halloween.  Jennifer testified
that, as she stood in the hallway waiting to testify, the prosecutor
11   approached her and said that, if she testified as expected, she
would look stupid because everyone else was saying something
12   different.  Also, a police detective approached her in the hall and
said if she was lying, he would find out and arrest her, and she
13   would be putting Richard's plea deal at risk.  He said he knew her
whole family was lying.  Jennifer admitted on cross-examination
14   that she initially told the police (a year earlier) that she could not
remember if she attended the gathering at Arellano's home before
15   or after Halloween.  She testified she was nervous when she spoke
to the detective.  She also admitted she did not like victim Jessica
16   Valdez, because Jessica was having sex with Jennifer's boyfriend.

17  *People v. Olague*, *supra*, at 51.

18    The defense moved for a mistrial on the ground that the government attempted to

19   intimidate the witnesses.  The trial court expressly disapproved of the government's conduct but

20   denied the motion because the witnesses' testimony helped the defense.  On appeal, the state

21   court held that the prosecution engaged in misconduct in the hallway conversations, but found

22   that the trial court did not abuse its discretion in denying a mistrial on this ground because there

23   was no prejudice.  *People v. Olague*, *supra*, at 52.

24    Once again, the state court's finding of no prejudice is reasonable.  Even assuming

25   that the prosecution's actions constituted misconduct, the misconduct did not sway Jennifer or

26   any of Betancourt's relatives to change their testimony, which ultimately was not adverse to the

14

defense.  In addition, the testimony at issue was not critical: "Just because family members saw Richard in Greenfield every day or did not see him in Woodland (assuming they have perfect recall) does not mean he could not have gone to Woodland."  *People v. Olague*, *supra*, at 52.

5.      Contact with Defense Expert

In response to a motion for sanctions including dismissal of the case, the prosecutor told the court:

> Dr. Leo (who had been retained by the defense in Christina Marten's trial) was listed as a defense expert in defendants' trial (apparently regarding false confessions).  The defense never provided the prosecution with any discovery regarding Dr. Leo and suddenly gave notice that he was being replaced by a Dr. Davis due to scheduling problems.  The prosecutor objected, and Arellano's lawyer told the prosecutor to "go ahead and call Dr. Leo if you don't believe my representation."  The prosecutor e-mailed Dr. Leo, identifying himself as the Yolo County District Attorney but not mentioning the case name.  The prosecutor presented a hypothetical fact pattern based on this case.  Dr. Leo did not appear to know about the case and agreed it was not a false confession case.  The prosecution did not intend to call Dr. Leo as a witness but did feel entitled to cross-examine the defense expert, who testified about Dr. Leo's research in the field, as to whether she was aware the fact pattern of this case had been "run by" Dr. Leo.  The prosecutor did not think he did anything wrong in contacting Dr. Leo.

*People v. Olague*, *supra*, at 52.  The defense indicated they had paid Dr. Leo $7,000 and prepared him as a witness.

The trial court found that the prosecutor's contact with Dr. Leo was improper and barred the prosecutor from using that contact at trial (although he could use Dr. Leo's published work).  The trial court denied the motion for dismissal or other sanctions.  On appeal, the state appellate court denied the claim of prosecutorial misconduct, finding "no prejudice under any standard" since Dr. Leo did not provide any confidential information to the prosecutor, and the prosecutor was not allowed to use the contact at trial.  *People v. Olague*, *supra*, at 53.  This, too, was a reasonable determination of the facts and rejection of the claim was not contrary to, or an unreasonable application of clearly established federal law.

1          6.      Cumulative Effect

2          For the reasons set forth, the alleged acts of prosecutorial misconduct, whether

3  taken individually or in combination, do not require reversal because Olague fails to demonstrate

4  that prejudice ensued.

5          B.      Grounds Three and Four: Instructional Errors

6          Olague was convicted of murder on the theory that he aided and abetted or

7  conspired to commit one of three target crimes (murder, simple assault, or assault by means of

8  force likely to produce great bodily injury) and, if one of the latter two, that the murder was the

9  natural and probable consequence of the assault.  The jury was so instructed.  Olague makes two

10 allegations of error in regard to the instructions given, as set forth below.

11         A claim of instructional error does not raise a cognizable federal claim unless the

12 error, considered in context of all the instructions and the trial record as a whole, "so infected the

13 entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62,

14 71-72 (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977); *Cupp v. Nauhten,*

15 414 U.S. 141, 146-47 (1973).  In addition, on federal habeas corpus review, no relief can be

16 granted without a showing that the instructional error had a "substantial and injurious effect or

17 influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)

18 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

19         1.      Accomplice/ Natural and Probable Consequence Instructions

20         Olague contends the trial court erred in defining simple assault as one of the target

21 offenses.  He points out that the prosecutor urged the jury to consider the evidence in the gang

22 context.  Citing California law, he contends the natural and probable consequence doctrine

23 usually applies in the gang context to escalating violence that turns a contemplated nonviolent or

24 minimally violent crime into a much more serious offense.  This, of course, is not what occurred

25 in this case.  Therefore, he argues, the evidence did not support the prosecution's theory of the

26 case and the court erred when it instructed the jury he could be convicted as an aider and abettor

or conspirator based on the target offense of simple assault.  Under California law, when the

prosecution relies on a natural and probable consequences theory, in order to instruct on a target

crime the trial court must find that "the jury could reasonably find that the crime actually

committed... was a 'natural and probable consequence' of the specifically contemplated target

offense." *People v. Prettyman*, 14 Cal.4th 248, 269 (1996).  On appeal, however, the state court

rejected Olague's claim of error for a lack of prejudice.  *People v. Olague*, *supra*, at 45.

In *Griffin v. United States*, the United States Supreme Court decided the question

"whether, in a federal prosecution, a general guilty verdict on a multiple-object conspiracy charge

must be set aside if the evidence is inadequate to support the conviction as to one of the objects."

*Griffin*, 502 U.S. 46, 48 (1991).  In deciding the issue, the *Griffin* court drew a distinction

between a mistake about the law, which is subject to the rule generally requiring reversal, and a

mistake concerning the weight or the factual import of the evidence, which does not require

reversal if another valid basis for conviction exists.  The Court explained:

> That surely establishes a clear line that will separate *Turner* [*v.
> United States*, 396 U.S. 398 (1970)] from *Yates* [*v. United States*,
> 354 U.S. 298 (1957)], and it happens to be a line that makes good
> sense.  Jurors are not generally equipped to determine whether a
> particular theory of conviction submitted to them is contrary to law
> - whether, for example, the action in question is protected by the
> Constitution, is time barred, or fails to come within the statutory
> definition of the crime.  When, therefore, jurors have been left the
> option of relying upon a legally inadequate theory, there is no
> reason to think that their own intelligence and expertise will save
> them from that error.  Quite the opposite is true, however, when
> they have been left the option of relying upon a factually
> inadequate theory, since jurors *are* well equipped to analyze the
> evidence [citation].

*Griffin v. Unites States*, 502 U.S. at 59 (emphasis in original).

In accordance with the rule of *Griffin*, the state appellate court found that the jury

in Olague's case "was fully equipped to detect that there was no evidence that the planned crime

was merely a simple assault" where "no one argued this was a simple assault, and the evidence

showed at a minimum a planned assault with a gun."  *People v. Olague*, *supra*, at 45.  No relief is

1    available since the state court's rejection of the claim in this manner was consistent with, and a

2    reasonable application of the relevant Supreme Court precedent.

3                      2.      Requested Pinpoint Instruction

4                      Olague additionally contends the trial court erred in denying his requested

5    pinpoint instruction that the act, knowledge and intent required for aiding/abetting must be

6    formed before or during the crime.  Olague argues that an instruction on timing was necessary

7    because there was evidence that (1) he was at the scene of the crime after the shooting; (2) he

8    told others to remain silent; and (3) he threatened the jailhouse snitch.  On appeal, the state court

9    found no error in the denial of the requested pinpoint instruction:

10                  [T]he court refused the instruction because it was redundant and
                    already covered in other instructions, which said there must exist a
11                  union of act and intent, and a person aids/abets when he, with
                    knowledge of the unlawful purpose and with intent to facilitate the
12                  crime, by act or advice aids, promotes, encourages or instigates the
                    commission of the crime.  We are unpersuaded by Olague's
13                  complaint that the instruction did not mention timing.

14   *People v. Olague*, *supra*, at 48.

15                     Olague fails to meet the demanding standard for habeas corpus relief based on an

16   alleged instructional error.  The trial court's rejection of the requested pinpoint instruction did

17   not render his trial fundamentally unfair in violation of due process.  The concept of the

18   additional instruction was already covered by the standard instructions as explained by the state

19   appellate court.  *See generally Duckett v. Godinez*, 67 F.3d 734, 743-46 (9th Cir. 1995) (holding

20   that due process does not require the trial court to instruct on the defendant's precise theory of

21   the case where other instructions adequately cover the defense theory).  No relief is available for

22   either of Olague's claims of instructional error.

23

24                  C.      Ground Five: Denial of the Defense Motion for Acquittal

25                     At the close of the prosecution's case-in-chief, Olague moved for a judgment of

26   acquittal on the ground that there was insufficient evidence to establish he had knowledge that a

crime would be committed.  He argued there was no evidence he had a motive as did other

participants who participated in exchange for drugs (Cervantes) or to pay off a drug debt

(Easlon).  Olague argued that there was only insignificant evidence that he was at the scene of the

crime, in addition to uncorroborated accomplice testimony.  The trial court found the evidence

sufficient to go to the jury and denied the motion.  The court of appeal similarly concluded that

substantial evidence supported the judgments:

> [T]here was more than mere presence at the scene.  Olague
> admitted he ran from the police because he thought he matched the
> description of a perpetrator, and on appeal Olague admits there was
> evidence that he threatened jailhouse informant Bowie.  Olague
> claims the trial court disregarded the evidence that he ran from the
> scene, because when the prosecutor raised the point, the court said,
> "If you were innocent and heard that description you might run too
> though."  However, the prosecutor challenged that conclusion, and
> the court said, "Okay."  Olague argues that threatening [the
> jailhouse snitch] holds little corroborative weight, because he may
> have been sticking up for his fellow gang members, and jailhouse
> snitches are frequently subject to danger from gangs for
> cooperating with police, whether or not the individuals making the
> threat are involved in the actual crime.  However, threatening [the
> jailhouse snitch] plus running from the police together provide the
> requisite slight corroboration connecting Olague to these offenses.
>
> We need not discuss the parties' dispute whether other evidence
> sufficed as corroboration, or whether the uncharged conspiracy
> lightened the corroboration requirement.

*People v. Olague*, *supra*, at 49.

It appears that the erroneous denial of a motion for acquittal at the close of the

prosecution's case does not present a cognizable claim for federal habeas corpus review.  *See*

*Hernandez v. Cowan*, 200 F.3d 995, 998 (7th Cir. 2000).  In *Hernandez*, the United States Court

of Appeal for the Seventh Circuit found no basis in federal constitutional law as set forth by the

Supreme Court for the proposition that due process is violated by the denial of a motion to acquit

in the middle of a case, even where the ruling was erroneous under state law.  *Id*.  The Seventh

Circuit noted that a jury is entitled to consider all the evidence, regardless of which side

introduced it, and so can rely on evidence presented by the defendant, which he may erroneously

1    have believed to be exculpatory.  *Id.*

2             Moreover, a significant basis for Olague's claim of insufficient evidence was the

3    lack of corroboration of accomplice witnesses, as required under state law.  Corroboration of

4    accomplice testimony is not constitutionally mandated.  *See United States v. Lopez*, 803 F.2d

5    969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a

6    conviction unless the testimony is incredible or unsubstantial on its face."); *United States v.*

7    *Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due

8    process, the use of accomplice testimony is not catalogued with constitutional restrictions.").  No

9    relief is available for this ground as the state court's ruling that the trial court properly denied the

10   motion was not contrary to, or an unreasonable application of clearly established federal law.

11            D.       Ground Six: Admission of Hearsay through the Gang Expert

12            At trial, the prosecution's gang expert testified that he relied on the statement of

13   Christina Marten (a non-testifying defendant who was tried separately) to support his conclusion

14   that Olague held a leadership role within the Sureno gang  On appeal, the state court

15   summarized:

16            Olague's attorney asked the gang expert, Sergeant Gill, "What's
              this leadership role you're talking about that Mr. Olague is
17            supposed to be taking?"  Gill answered, "According to Christina
              Marten, he actually had met with Neto [Arellano] in the apartment,
18            had discussed-[¶] ... [¶] ... Christina Marten, during her statement
              to me, indicated that he was the go-between between Candy Garza
19            who, again, would be in a higher status, in my opinion, than Mr.
              Olague, and he was dealing with the Sureño side of things and was
20            there for- with Oscar [Cervantes] when the incident occurred."
              Cervantes objected to the reference to him, but Olague did not
21            object.  Gill stated that other witnesses in the investigation had said
              the same thing.  Gill testified, without defense objection, that
22            Marten said she was selling drugs for Arellano.  Later, at Olague's
              request, the court indicated it would instruct the jury that hearsay
23            in the expert's testimony was offered not for the truth of the matter
              but simply as a foundation for the expert's opinion. The prosecutor
24            agreed, except for statements the expert took from defendants
              which (according to the prosecutor) should include coconspirator
25            Christina Marten. Olague disagreed regarding Marten.

26            The court instructed the jury, "you need to understand that experts

are allowed to testify on a number of subjects that nonexperts can't testify to. They can base their opinions on any number of things, including hearsay. That hearsay that they're basing their opinion on cannot be used for the truth of the hearsay, Mary Jane told me blah, blah, blah, and I'm basing my opinion based upon that.  He can base his opinion on that, but that doesn't mean that Mary Jane said blah, blah, blah. That's hearsay. [¶] Statements made by the defendants to this officer is [*sic*] not hearsay. That's for the truth of the matter. Statements made by coconspirators to the officer is not hearsay [*sic*], but what Mary Blogett or Henry Jane [*sic*] said to the officer, he's basing his opinion based upon that. That's hearsay and you cannot consider those statements for the truth of the matter stated."

The court asked counsel if that was a fair summary. No one objected.

Over Olague's objection, the court allowed the prosecutor to follow up regarding the information that Olague played a leadership role.  The expert answered, "From Christina Marten when she was present when a discussion was about killing Stepper that Olague came to the apartment where Neto was and was involved at the end of that discussion.  And she said that Mr. Olague's role, I guess, as you will, or she saw him walking behind her with Mr. Cervantes on the night he [*sic*] was killed." The court sustained an objection as to Cervantes.

The attorneys later agreed Marten's statement to Gill was hearsay and could not be used for truth of the matter asserted, but could be used as a basis for the expert's opinion. Accordingly, the trial court instructed the jury that "[c]ounsel have stipulated that th[e] statements attributed to Christina Marten [and made] to Sergeant Gill may not be considered by you for the truth of the matter she allegedly stated to him, but may only be considered by you as a basis for his opinion-he based his opinion on what she told him, that does not make it true. [¶] ... [¶] Okay.  So it may not be considered for [*sic*] you-for the truth of the matter that it was, in fact, truth but it may be considered for [*sic*] you only as it gives a basis, if any, for Sergeant Gill's opinions as an expert."

*People v. Olague*, *supra*, at 28.

Olague contends the statement was inadmissible for any purpose because it was hearsay and because it violated the rule of *Crawford v. Washington*, 541 U.S. 36 (2004).  On appeal, the state court rejected the claim, holding that any error was harmless because the evidence was cumulative of other evidence.  *People v. Olague*, *supra*, at 29.

In *Crawford v. Washington*, the United States Supreme Court held that the Sixth

Amendment is violated when testimonial hearsay evidence is admitted under circumstances where the criminal defendant had no opportunity to conduct a cross examination. *Crawford*, 541 U.S. 36, 68 (2004). The *Crawford* Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" but gave examples: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*.

"State court rulings on the admissibility of evidence generally fall outside the scope of federal habeas relief, which is designed only to remedy violations of federal law." *Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007); *see also Estelle*, 502 U.S. at 67-68; *Williams,* 529 U.S. at 375. The Ninth Circuit Court of Appeals has observed that the Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process, but has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citation omitted)).

Assuming for purposes of this report that the improper admission of hearsay evidence under some circumstances rises to the level of a due process violation warranting relief under the AEDPA, this is not such a case. As the state court held, any error was harmless.

On federal habeas corpus review, the standard for harmless error is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *see also Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999) (harmless error analysis applies to erroneous admission of hearsay statements); *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (harmless error analysis applies to alleged violations of the Confrontation Clause). In this case, introduction of Marten's statement did not render Olague's trial fundamentally unfair and did not have substantial and injurious effect or influence on the jury's verdict. First, the hearsay was cumulative to other evidence that was received. *See Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (potential prejudice is diminished if

erroneously admitted evidence is merely cumulative to other evidence) (overruled on other grounds); *Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993) (erroneous admission of police officer's hearsay testimony used to prove mens rea did not render trial fundamentally unfair where other evidence established mens rea).  In particular, the state appellate court noted other evidence had shown that Olague was Arellano's link to Garza, that Olague accompanied Cervantes to the crime scene, and that Olague had told the expert he was an "old gangster" with influence over other Sureños.  *People v. Olague*, *supra*, at 29.  Moreover, while various inferences could be drawn from evidence of Olague's leadership status, the hearsay evidence admitted did not go directly to any element of the offense.  Under these circumstances there is no reasonable probability that the jury would have reached a different result but for admission of the expert's hearsay statements and Olague is not entitled to relief.

       E.       Ground Seven: Exclusion of Evidence of Third Party Culpability

       Olague claims he was denied his right to present a complete defense when the trial court excluded evidence of third party culpability.  On appeal, the state court set forth a detailed background summary to this claim:

> The trial court conducted an Evidence Code section 402 hearing. The defense called as a witness Rudy Gonzalez, who refused to answer questions. Arellano's investigator, James Peoples, testified regarding an interview he conducted with Rudy Gonzalez in February 2006 (more than three years after Halloween 2002), in which Gonzalez supposedly made statements against his penal interest. According to Peoples, Gonzalez said he knew Cervantes did not commit the crime and wanted to help because Cervantes has a child. Gonzalez said he and other Sureños decided on Halloween night "to get a buster" (a Norteño). They had no one in mind; it was random. They had guns, including a .22 caliber. Gonzalez said he stayed home, while the others drove around in two cars, looking for Norteños. It thus appears, Gonzalez was relating hearsay when he told Peoples the Sureños drove around, came upon the victims, drove around the block, let out one of the Sureños to do the shooting, drove to a park and waited, then returned to Gonzalez's home. Peoples said Gonzalez said he heard on a police scanner the report of gunshots fired. Peoples said that Gonzalez said that Bowie said he was going to use Cervantes to get out of his own (Bowie's) case.

Marcelino Michel, a (former) Norteño who shared a jail cell with David Cordero, testified that Cordero stated in jail that he was drinking at the home of Rudy Gonzalez that Halloween night. Gilberto Lopez, Guillermo Ramirez, and Rudy Gonzalez, Sr., left to "smoke" a Norteño and later returned, acting "weird," after a police scanner in the home reported gunshots fired.

David Cordero took the stand at the hearing and denied making the statements to Michel. Cordero said he was at Rudy Gonzalez's home that night. There was a scanner there. Cordero drank beer and got beat up.

The trial court ruled Gonzalez's statement was inadmissible because it was not against his penal interest, was not proper third party culpability evidence, was unreliable, and was more prejudicial than probative...

At a later hearing under Evidence Code section 402, Mark Estrada refused to answer questions. Carlos Munoz testified he and his friend Estrada were Sureños. According to Munoz, Estrada on the day after the Halloween shootings said that he and his family, which included Rudy Gonzalez, "had something to do with it," "[t]hat they just disposed of the gun" by throwing it off a bridge. When asked if he remembered telling defense investigators that Estrada said his cousin and family did the shooting, Munoz said yes, "I remember him telling me that."

The trial court did not allow Peoples to testify and limited Munoz's testimony, noting Estrada's statement about involvement was limited to disposing of the gun and, even if it might subject Estrada to liability as an accessory after the fact or coconspirator, such involvement would not absolve any of these defendants (as required for third party culpability evidence)

In front of the jury, Cordero testified he was at Gonzalez's home on Halloween and got beat up, but he denied telling Michel anything about a shooting.

Michel testified to the jury that, in jail, Cordero said he was at Rudy's house that night; Rudy Sr. left with Gilberto Lopez and Guillermo Ramirez and returned acting strange; while they were gone, a police scanner in the house reported gunshots were fired. Also, Veronica Lugo told Michel that Guillermo Ramirez bragged about being involved in the Halloween murders.

The trial court instructed the jury, "The defendants in this case have introduced testimony for the purpose of showing that another person or persons may have committed or been involved in a separate or different conspiracy, to commit the crimes for which these defendants are here on trial. If, after consideration of all the evidence, you have a reasonable doubt that any or all of these

1  defendants committed any of the crimes charged, you must find
   that defendant or those defendants not guilty."

2

3  The defense moved for a new trial based in part on the exclusion of
   third party culpability evidence. The trial court denied the motions.

4  *People v. Olague*, *supra*, at 35 -37.

5          Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,

6  or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution

7  guarantees criminal defendants a meaningful opportunity to present a defense and to present

8  relevant evidence in their own defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting

9  *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Chambers v. Mississippi*, 410 U.S. 284, 294

10 (1973). This right is not unlimited, but rather, is subject to reasonable restrictions. *United States*

11 *v. Scheffer*, 523 U.S. 303, 308 (1998). A state evidentiary rule excluding evidence does not

12 abridge a criminal defendant's right to present a defense unless it is "arbitrary or

13 disproportionate" and "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at

14 308; *Crane*, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to

15 exclude evidence at trial and the federal constitutional right to "present a complete defense").

16         The United States Supreme Court has noted that "rules regulating the admission

17 of evidence proffered by criminal defendants to show that someone else committed the crime

18 with which they are charged... are widely accepted[.]" *Holmes*, 547 U.S. at 326. The Supreme

19 court has not articulated a specific set of circumstances under which a criminal defendant must

20 be permitted to introduce evidence of potential third-party culpability. Under Ninth Circuit

21 precedent, proffered evidence is properly excluded where it simply affords a possible ground of

22 suspicion against a third party and does not "directly connect that person with the actual

23 commission of the offense[.]" *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th

24 Cir. 1993) (quoting *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983)).

25         In this case, the proffered third party culpability evidence was tenuous and, even if

26 believed by the jury, would not have absolved Olague. Since the offense involved an uncharged

conspiracy among many different people, evidence of a third party's involvement was not highly

probative as to whether Olague committed the offenses of conviction.  The trial court did allow

*some* of proffered third party culpability evidence.  Exclusion of the remainder did not deny

Olague his right to present a defense.  *See Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999)

(concluding that state trial court did not infringe defendant's constitutional rights by excluding

speculative third-party culpability evidence).  The state appellate court's rejection of this claim

did not involve an unreasonable determination of the relevant facts, nor was it contrary to or an

unreasonable application of clearly established federal law.

     F.  Ground Eight: Sentencing on the Firearm Enhancement

     On the attempted murder counts (counts 3 and 4), Olague was sentenced to nine

years for the principle count and a reduced, one-third term of two years and four months on the

subsequent count to be served consecutively pursuant to section 1170.1 of the California Penal

Code.  The court did not reduce to one-third the term of 25 years to life that Olague received for

a firearm enhancement allegation found true in connection with count 3.  For his final claim,

Olague contends that his term for this firearm enhancement should have also been reduced to one

third the midterm.  On appeal, the state court held that Olague was properly sentenced in

accordance with state law.

     This claim relates solely to the application of a state sentencing law.  Absent

fundamental unfairness, federal habeas corpus relief is not available for a state court's

misapplication of its own sentencing laws.  *Estelle*, 502 U.S. at 67; *see also Richmond v. Lewis*,

506 U.S. 40, 50 (1992) (the misapplication of state sentencing law results in a due process or

Eighth Amendment violation only if the sentence is arbitrary and capricious); *Brown v. Mayle*,

283 F.3d 1019, 1040 (9th Cir. 2002), vacated on other grounds, 538 U.S. 901, remanded to 66 F.

App'x 136 (9th Cir. 2003) ("The district court correctly concluded that this state law claim is not

cognizable on federal habeas review."); *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1989)

(petitioner not entitled to habeas relief on claim that state court improperly used prior federal

offense to enhance punishment); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (claim that prior conviction was not a "serious felony" under California sentencing law not cognizable in federal habeas corpus proceeding).  On the record of this case, no fundamental unfairness appears and Olague is not entitled to relief.

## VI.  CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 11, 2011

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE